UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT P. HUDSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:14-CV-456 JD |
| | ) |
| KEVIN KREMBS and | ) |
| AMDREW LIAW, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Hudson, a former inmate at the Westville Correctional Facility in Westville, Indiana, filed his complaint *pro se* alleging that prison staff denied him proper medical treatment after part of the facility's shower ceiling fell on him. Hudson originally brought claims against the prison warden, a prison nurse, and two doctors who treated him in the aftermath of his accident: Dr. Kevin Krembs and Dr. Andrew Liaw.

The Court screened the complaint, dismissed the warden and the nurse, and granted Hudson leave to proceed with four distinct claims against Dr. Krembs and Dr. Liaw, related to treatment he received on four separate dates. [DE 6] Pursuant to the parties' stipulation, the Court dismissed the claim against Dr. Liaw pertaining to the events alleged on January 8, 2013, with prejudice. [DE 64] That left Hudson with his two claims against Dr. Krembs, corresponding to the events on September 25, 2012, and September 27, 2012, and his one claim against Dr. Liaw, corresponding to the events on September 13, 2013. The doctors have moved for summary judgment [DE 62] and Hudson, now represented by counsel, responded in opposition. [DE 67] For the reasons stated herein, the Court will grant Defendants' motion.

## FACTUAL BACKGROUND

Hudson was an inmate at the Westville Correctional Facility from May 2012 until October 2013. Prior to arriving at Westville, he served time at the Reception Diagnostic Center. There, physical and psychological evaluations reported chronic back pain related to a car accident and an unspecified form of schizophrenia. Staff at the RDC performed x-rays on his cervical and dorsal spine regions, each with normal results.

On May 23, 2012, Hudson transferred to Westville, where Dr. Krembs served as the Medical Director and as a treating physician, and where Dr. Liaw also served as a treating physician. On September 20, 2012, ceiling tiles in the prison shower fell on Hudson, injuring him and requiring that he be sent to St. Anthony Hospital. Emergency room staff and doctors evaluated and treated Hudson, ordered CT scans, and diagnosed him with a lower back strain and a neck muscle strain. Hudson returned to Westville that same day, where Dr. Liaw evaluated him, prescribed Naproxen for his pain, and ordered a 3-day lay-in pass and a 7-day bottom bunk pass.

Around midday on September 25, 2012, Hudson visited Dr. Krembs at the prison, complaining of left shoulder and lower back pain. Dr. Krembs reviewed the hospital records and CT scan results, reviewed Hudson's current Naproxen prescription, performed an independent evaluation, and concluded that Hudson did not require any new medication for his pain. Later that night, Dr. Krembs received a phone call from one of the prison's nurses, who informed him that Hudson's pain was not controlled. In response, Dr. Krembs ordered two injections of pain medication and extended Hudson's lay-in and bottom bunk passes.

Over the course of the next year, Hudson complained about and was treated for problems with his back in December 2012 and January 2013, and made several requests for more

Naproxen in February 2013. The record does not indicate that Hudson had any medical problems over a six-month period from February 2013 until August 2013, when he started having pain in his back and hip.

Nurse Hutchinson evaluated and treated Hudson on September 13, 2013, in response to his complaint of back pain and swollen knees made about one week prior. The nurse contacted Dr. Liaw for treatment and orders, and Dr. Liaw prescribed one injection of pain medication and a 5-day lay-in pass. Less than one month later, Hudson transferred to Miami Correctional Facility in Bunker Hill, Indiana.

## STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

**DISCUSSION**

Hudson asserts that Dr. Krembs and Dr. Liaw violated the Eight Amendment's prohibition against cruel and unusual punishment through their deliberate indifference to his serious medical needs. To survive summary judgment on this claim, there must be evidence from which a reasonable juror could conclude that the doctors "knew about but consciously disregarded a serious medical condition." *Fitzgerald v. Greer*, 324 F. App'x 510, 514 (7th Cir. 2009). A constitutional claim based on inadequate medical care contains two elements: "(1) the prisoner suffered an objectively serious harm that presented a substantial risk to his safety, and (2) the defendants were deliberately indifferent to that risk." *Minix v. Canarecci*, 957 F.3d 824, 831 (7th Cir. 2010); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).[1]

Deliberate indifference requires a dual showing that the defendants (1) had subjective knowledge of a risk to the inmate's health, and (2) intentionally disregarded that risk. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010); *Minix*, 597 F.3d at 831 "For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the

---

[1] Defendants devote only a single paragraph to the notion that Hudson never developed an objectively serious medical condition from his shower accident. In support, the Defendants note that the hospital staff described Hudson's neck and lower back strains as "mild." [DE 63 at 14] True, an objectively serious medical condition includes one diagnosed by a doctor yet "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007) (internal citations omitted), but Hudson has created an issue of material fact here that would otherwise would preclude summary judgment if not for his shortcomings on the issue of deliberate indifference. The hospital doctors diagnosed him with these strains, which, if not treated properly, could result in further damage over time. [DE 67-6 at 11:5-13:6] *Carr v. Schloboam*, No. 96-2802, 1997 WL 284626, *2 (7th Cir. May 22, 1997) ("A medical condition is serious where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.") (internal citations omitted).

decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quotation marks and citations omitted).

Deliberate indifference is a high standard. Even medical malpractice and incompetence do not state a claim of deliberate indifference. *Walker v. Peters*, 233 F.3d 494 (7th Cir. 2000). "Under the Eighth Amendment, [a prisoner] is not entitled to demand specific care. She is not entitled to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Moreover, a "disagreement with medical professionals [does not] state a cognizable Eighth Amendment Claim under the deliberate indifference standard of *Estelle v. Gamble* [429 U.S. 97 (1976) ]." *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). Deliberate indifference is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (citations omitted). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

**A. Dr. Krembs**

Hudson levies two claims against Dr. Krembs: that Dr. Krembs acted with deliberate indifference toward his serious medical needs by (1) refusing to alter his pain medication from his Naproxen regimen on September 25, 2017, and by (2) likewise refusing to alter that same prescription two days later. For the reasons stated below, no genuine issues of material fact remain such that a reasonable factfinder could label Dr. Krembs' medical treatment as deliberately indifferent.

Dr. Krembs examined Hudson on September 25, 2012, five days after Hudson returned from the hospital. [DE 63-4 ¶ 6] When called for his appointment, Hudson walked to Dr. Krembs' office and got up on the examination table. *Id.* Based in part on Hudson's walking, Dr. Krembs determined that he had no gross dysfunction in any movements or in his legs. *Id.* During the examination, Hudson complained of left shoulder and lower back pain, but Dr. Krembs discovered no corresponding objective findings such as a muscle spasm, asymmetry, deformity, swelling, or inability to move a limb. *Id.* Dr. Krembs' only findings were that Hudson complained of pain and was tender when Dr. Krembs pressed on his lower back. *Id.*

During this appointment, Dr. Krembs reviewed Hudson's medical records from the prior week, including the hospital records related to his shower accident. *Id.* The hospital records discussed Hudson's tenderness and pain complaints, but also reported a lack of objective findings related to his cervical back and lumbar back. [DE 63-1 at 10] As to Hudson's neurological status post-accident, he reported a subjective decreased sensation in both his feet and ankles. *Id.* Hospital staff also reported that Hudson would not move his legs when asked, but that he moved both of them when left alone. *Id.* The hospital doctor diagnosed Hudson with a low back strain and a neck muscle strain. *Id.* According to Dr. Krembs, a strain can happen to anyone and can be likened to getting a "twinge" in one's back when trying to lift a heavy object. [DE 67-5 at 18:16-23] A strain usually takes about six to eight weeks to heal, but cases can sometimes require as much as three months to resolve. *Id.* at 55:6-11. Dr. Krembs also read Hudson's CT scans results to him, which revealed no abnormalities. [DE 67-5 at 28:14-17; 63-1 at 17]

In addition, Dr. Krembs reviewed Hudson's current medications with him, including Dr. Liaw's prescription for the maximum recommended amount of Naproxen: two daily doses of

6

500 milligrams. [DE 63-4 ¶ 6; DE 67-4 at 32:3-4] Hudson claims that he questioned the Naproxen's effectiveness at his appointment, but Dr. Krembs considered Naproxen to be a "completely suitable medicine for back strain" and a "safe, tried-and-true medicine that [he] thought was appropriate in this case." [DE 67-1 ¶ 16; DE 67-5 at 34:18-22] Dr. Krembs did not, at *that* appointment on September 25, 2012, prescribe any new medication for Hudson or increase his Naproxen dosage, but he did instruct Hudson to refrain from certain physical activities, such as recreational sports. [DE 67-5 at 29:5-13]

At around 10:30 p.m. on that same date, Dr. Krembs received a call from a nurse at the prison's urgent care desk, who reported that Hudson's pain was not controlled on his current medication. [DE 63-4 ¶ 7] Based on the information relayed by the nurse, Dr. Krembs believed Hudson required stronger pain medication and ordered two separate injections for Hudson, to be administered immediately: 125 milligrams of Solu-Medrol and 30 milligrams of Toradol, a combination Dr. Krembs has had success with in the past. [DE 63-4 ¶ 7; DE 63-2 at 72-73; DE 67-5 at 43:9-11] In Dr. Krembs' opinion, Solu-Medrol is an excellent anti-inflammatory drug, and he prescribed Hudson a standard amount. [DE 41:24-42:15] Dr. Krembs also ordered the greater of two standard doses of Toradol, another excellent anti-inflammatory drug and a very strong pain medication equivalent in analgesic effect to a narcotic. [DE 63-4 ¶ 7; DE 67-5 at 42:18-22] Lastly, Dr. Krembs ordered a 3-day lay-in pass and a 7-day bottom bunk pass for Hudson. [DE 63-2 at 72-73]

Hudson argues that Dr. Krembs treated him with deliberate indifference on September 25, 2012, because Dr. Krembs prescribed nothing new in response to Hudson's complaint that his pain had increased since returning from the hospital. [DE 67 at 16] This position completely ignores the fact that Dr. Krembs took a night call regarding Hudson's pain only ten hours after

his initial evaluation, learned that his pain was not controlled, and ordered two shots of stronger pain medication to supplement the current Naproxen regimen. Therefore, Hudson's reliance on cases where medical personnel prescribed "known ineffective" courses of treatment misses the mark. *See, e.g.*, *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005) (vacating grant of summary judgment for defendant doctor where defendant refused to refer inmate to a specialist for years – despite the recommendation of another doctor – during which the inmate suffered severe intestinal distress ultimately diagnosed as esophageal cancer); *Rice v. Walker*, No. 06-3214, 2010 U.S. Dist. LEXIS 25232 (C.D. Ill. Mar. 16, 2010) (denying summary judgment for defendants where they treated inmate's softball-sized tumor with ibuprofen and an occasional x-ray for months).

Moreover, during the initial appointment on September 25, Dr. Krembs reviewed the applicable medical records and CT scans, conducted an independent examination of Hudson, came to his own conclusions, and decided to stay the course of treatment with Naproxen as initiated by Dr. Liaw, coupled with an explanation to Hudson that he should refrain from participating in strenuous physical activities. Thus, Hudson's complaint boils down to a disagreement with the type of treatment provided. Without evidence that the treatment departed so substantially from accepted professional standards as to demonstrate that Dr. Krembs was not actually relying on his medical judgment, this claim must fail. *Jackson*, 541 F.3d at 698 ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner."); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances."); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("Medical decisions that may be

characterized as 'classic example[s] of matter[s] for medical judgment,' such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview. Such matters are questions of tort, not constitutional law.") (quoting *Estelle*, 429 U.S. at 107). As such, the Court will grant the motion for summary judgment as to Dr. Krembs' treatment of Hudson on September 25, 2012.

On September 27, 2012, Hudson states that he returned to the Health Care Unit because of migraines and because his back pain had increased threefold. [DE 67-1 ¶ 18] Based on Hudson's account, Dr. Krembs refused to change or increase his medication and told him to "man up." *Id.* ¶ 19. Dr. Krembs claims he did not see Hudson on September 27, 2012, but that he instead got a call from a nurse requesting an extension for Hudson's bottom bunk pass. [DE 63-4 ¶ 8] Dr. Krembs ordered a 14-day bottom bunk pass for Hudson in response. [DE 63-3 at 2] So, a genuine dispute apparently exists over whether Dr. Krembs even saw Hudson on September 27, 2012, but that fact does not create a material issue to defeat summary judgment. Nothing in the record, let alone Hudson's affidavit, could be interpreted by a reasonable factfinder to mean that Dr. Krembs *knew* that Hudson's pain had increased threefold. Unlike at other points in his narrative where Hudson explained his symptoms in detail to medical personnel [DE 67-1 ¶¶ 9, 13-14], he does not maintain that he informed Dr. Krembs or anyone else of his symptoms on September 27. *Id.* ¶ 18. Nor does the record indicate that the Health Care Unit nurse described any symptoms to Dr. Krembs when requesting that Hudson's bottom bunk pass be extended. Without knowledge of Hudson's purported migraines and threefold increase in pain, Dr. Krembs did not act with deliberate indifference by extending Hudson's bottom bunk pass. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("Deliberate indifference may occur where a prison official, *having knowledge of a significant risk to inmate health or safety*, administers 'blatantly

inappropriate' medical treatment …..") (internal citations omitted and emphasis added); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (Deliberate indifference requires a showing that the prison official acted with the requisite culpable state of mind, which requires showing that the official had subjective knowledge of the risk to the prisoner's health.). Therefore, the Court will grant the motion for summary judgment as to Dr. Krembs' treatment of Hudson on September 25, 2012.

### B. Dr. Liaw

Hudson claims that, when he received treatment at the Health Care Unit on September 13, 2013, Dr. Liaw acted with deliberate indifference toward his serious medical needs by prescribing a 5-day lay-in pass that had "without food" written on it. However, based on the record before the Court, no reasonable factfinder could find that Dr. Liaw acted with the culpable state of mind necessary for deliberate indifference.

On September 5, 2013, Hudson submitted a request for medical treatment because, according to him, he "was unable to move or sit up to do almost anything." [DE 67-1 ¶ 25] However, on his written complaint, he only informed medical personnel that his "back still hurts and [his] knees are swollen now also…." [DE 63-2 at 85] Due to a dormitory change, Hudson did not attend his scheduled nurse visit for this complaint until September 13, 2013. [DE 67-1 ¶ 25; DE 63-2 at 89] The only symptoms listed in the record from his September 5, 2013, written request up to and including his September 13, 2013, visit – either complained of or observed – include: back pain; knee pain; swelling in the knees and left flank (lower left back); and a pain level of 8/10 on the Numeric Pain Intensity Scale. [DE 63-2 at 85-90; DE 67-4 at 63:10-24] Hudson's vital statistics at the September 13, 2013, visit, included a normal blood pressure of

10

120/60 and a pulse of 56 beats per minute, at the lower end of normal. [DE 63-2 at 90; DE 63-5 ¶ 7]

A nurse conducted Hudson's examination on September 13, 2013, and subsequently contacted Dr. Liaw for "treatment and orders," informing him of Hudson's subjective complaints and objective conditions. *Id.* The nurse did not inform Dr. Liaw that Hudson had any mobility issues or that he could not walk, nor did anyone else inform Dr. Liaw that Hudson experienced trouble with his activities of daily living. [DE 63-5 ¶ 7] And, once again, Hudson does not maintain in his narrative that he reported mobility issues to anyone; indeed, the record contains nothing to suggest that a reasonable factfinder could find that even the nurse knew about any of Hudson's purported inability to move. [DE 67-1 ¶ 25] Based on the information he received, Dr. Liaw ordered a 125 milligram injection of Solu-Medrol along with a 5-day law-in pass that read, "general lay-in without tray x 5 days." [DE 63-2 at 90; DE 63-3 at 2]

Hudson argues that, by writing "without tray" on his lay-in pass, Dr. Liaw was deliberately indifferent to his medical needs because the note gave Hudson two options: either "starve or risk further injury and damage to the nerves and ligaments in his back trying to get to the dining area." [DE 67 at 22] The Court finds this argument unpersuasive. First, the record makes clear that a lay-in pass that has "without tray" written on it and a lay-in pass lacking those extraneous words have the exact same effect: they each excuse the inmate from going to work or class and allow him to rest in bed when he would otherwise not be allowed to do so, such as after count times. [DE 63-4 ¶ 7; DE 67-4 at 69:7-11] Neither "lay-in" nor "lay-in without tray" mean that the inmate gets food brought to him; he still has to get himself to the dining area if he wants to be served a meal. [DE 63-4 ¶ 7] Thus, Dr. Liaw did not "*deliberately* order[ ] the lay in be *without food* …" as Hudson argues in response to the instant motion. [DE 67 at 22] (emphasis in

the original). Second, Hudson makes no claim that he actually went without food during his lay-in period, and the record does not support such a notion. Third, and most importantly, as far as Dr. Liaw *knew*, Hudson did not suffer from any mobility impairments or any significant loss of function, which would include not being able to dress himself, go to the dining area, go to classes, or go to work. [DE 63-5 ¶ 7; DE 67-4 at 74:11-76:1] So, even if taken as true that Hudson could not walk to the dining area, without knowledge of such a condition, Dr. Liaw did not act with deliberate indifference by writing Hudson a 5-day lay-in pass. *See Perez*, 792 F.3d at 777; *Gayton*, 593 F.3d at 620.[2] Therefore, the Court will grant the motion for summary judgment as to Dr. Liaw's treatment of Hudson on September 13, 2013.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment [DE 62] is hereby **GRANTED** in its entirety. As this dispenses with all of Plaintiff's remaining claims, the Clerk is hereby **DIRECTED** to enter judgment.

SO ORDERED.

ENTERED: November 6, 2017

/s/ JON E. DEGUILIO
Judge
United States District Court

---

[2] While neither alleged in the complaint nor identified in the Court's screening order, Hudson's response to the instant motion accuses Dr. Krembs of likewise writing Hudson "a prescription to lay in pain without food for three days" because "Mr. Hudson was unable to walk to the chow line or the commissary" on September 25, 2012. [DE 67 at 16] This argument fails for the same reasons as stated above regarding Dr. Liaw's 5-day lay-in pass. Hudson claims that he could not walk to the dining area on or about September 20-22, 2012 [DE 67-1 ¶¶ 10-11], but he says nothing about having mobility issues when he went to see Dr. Krembs on September 25, 2012. Nothing in the record suggests that he could not walk on that date, and moreover, even *if* he could not walk, nothing suggests that Dr. Krembs knew about any such mobility issue. Again, Dr. Krembs observed Hudson walk into his office on September 25, 2012, and determined that he had no gross dysfunction in any movements or in his legs. [DE 63-4 ¶6]